IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **GREGORY M. PRUITT,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    2:11-CV-1179-KOB |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of the Social** | ) |
| **Security Administration,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On August 11, 2008, the claimant, Gregory Michael Pruitt, filed a Title II application for disability insurance benefits and a Title XVI application for supplemental security income benefits. (R. 91). The claimant originally alleged disability commencing on February 1, 2008, but later requested that his onset date be amended to April 1, 2008. (R. 21). After the Social Security Administration initially denied his claims on October 24, 2008 (R. 98), the claimant filed a timely written request for a hearing before an Administrative Law Judge. (R. 105). The ALJ held a hearing on December 16, 2009. (R. 21). In a decision dated January 26, 2010, the ALJ found that the claimant was not disabled as defined in the Social Security Act, and thus was ineligible for supplemental security income. (R. 33).

On February 3, 2011, the Appeals Council denied the claimant's request for review. (R. 1-3). Consequently, the ALJ's decision became the final decision of the Commissioner of the

1

Social Security Administration. See 20 C.F.R. § 404.955. Because the claimant has exhausted his administrative remedies, the case is now ripe for judicial review. This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1382(c)(3). For the reasons stated below, the court affirms the Commissioner's decision.

## II. ISSUE PRESENTED

The claimant presents the following issue for review: whether the ALJ committed reversible error by not ordering consultative examinations for the claimant's physical and mental limitations as part of the ALJ's duty to develop the record.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if substantial evidence supports the factual conclusions. See 42 U.S.C. § 405(g); Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

"No... presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." Walker, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings." Walker, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. Hillsman v. Bowen, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the claimant presently unemployed?
> (2) Is the claimant's impairment severe?
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the claimant unable to perform his or her former occupation?
> (5) Is the claimant unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

Because a hearing before an ALJ in a Social Security matter is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record. Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003); Graham v. Apfel, 129 F.3d at 1422. The regulations provide that the ALJ may order a consultative examination when warranted. 20 C.F.R. §§ 414.1517, 416.917. Given the ALJ's duty to develop the medical record fully and fairly, "[i]t is

3

reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision"; where substantial evidence supports the ALJ's decision, the ALJ does not err by denying claimant's request for a consultative examination. Holladay v. Bowen, 848 F.2d 1206, 1209-10 (11th Cir. 1988); see also Reeves v. Heckler, 734 F.2d 519, 522 n1 (11th Cir. 1984). An ALJ is not required to seek additional independent expert medical testimony before making a disability determination if the record is sufficient and the additional expert testimony would not be necessary. Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999).

"Residual functional capacity" ("RFC") is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.); see also 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, pull, etc. 20 C.F.R. §§ 404.1545(b), 416.945(b).

A three-part "pain standard" applies when a claimant attempts to establish disability through his own testimony or other subjective symptoms. The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002); see also Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Kelley v. Apfel, 185 F.3d 1211, 1215 (11th Cir. 1999).

**V. FACTS**

At the time of the administrative hearing, the claimant was twenty-four years old with a general equivalency diploma ("G.E.D."). (R. 51 - 52). His past work experience includes employment as a security guard, construction laborer, machine operator/tender, petrol supply specialist in the army, warehouse worker, and fast food restaurant cashier. (R. 78 - 81, 193). The claimant originally alleged his disability onset date to be February 1, 2008. However he requested to amend his onset date to April 1, 2008, which the ALJ granted. (R. 21, 23). The claimant's severe medical impairments include levoscoliosis, depression, and headaches. (R. 23).

*Physical and Mental Limitations*

The claimant alleges debilitating back pain that renders him incapable of sustaining employment because "[the pain] is so severe." (R. 54). He claims to have not had a pain-free day since April 1, 2008. (R. 54). On January 25, 2007, the claimant underwent a magnetic resonance imaging ("MRI") of his thoracic and lumbar spine. The findings of the radiology report revealed "mild levoscoliosis with kyphosis[1] of the thoracolumbar spine[2]... [with n]o significant degenerative disc pathology identified." (R. 232). Additionally, the report indicates "no significant lumbar spine abnormality seen." (R. 235).

Records indicate that in May 2007, Dr. Jacquline Perry at the Birmingham Veterans' Administration Medical Center ("BVAMC"), the claimant's primary care provider, ordered a Consult Request for physical therapy for the provisional diagnosis of "low back pain / scoliosis"

---

[1] Kyphosis is an outward curvature of the thoracic region of the spine resulting in a rounded upper back.

[2] The thoracolumbar spine is the area ranging from the thoracic to the lumbar regions of the spine.

that included water aerobic exercises twice a week for four weeks. (R. 242). In July 2007, the claimant received an order for a back brace and a TENS unit[3] and its accompanying supplies. (R. 244). At the time of his physical therapy consult with Jenesis Safford on July 24, 2007, the claimant was employed as a full-time security guard and reported a current pain rating of 3 out of 10. (R. 247). He also reported that picking objects up from a seated position, or bending over, aggravated his pain, but that Lortab and hot showers "help somewhat with the pain." Id. The claimant did not show up for only one of his scheduled physical therapy appointments. (R. 246).

On October 6, 2008, the claimant underwent a compensation and pension examination at the BVAMC. The claimant's medications included Ibprofin, Lortab, and Flexeriol. (R. 392). The claimant reported that his back pain only mildly to moderately affected his usual daily activities including chores, exercise, sports, recreation, and traveling. (R. 416) However, in all other activities of daily living, the claimant suffered no effects from his back pain. Id.

In October 2008, the claimant first complained of a gradual onset of headaches over the previous few months. (R. 416). He reported that they felt like sinus headaches, occurring once or twice a week and lasting forty-five minutes each, but that stress made them worse. Id. The examining physician, Dr. Sean Hatton, diagnosed the claimant with tension headaches that had no effect on the claimant's usual daily activities. (R. 418). The examiner opined that no correlation likely existed between the claimant's headaches and his thoracic kyphosis. (R. 471). Dr. Hatton further reported that the headaches started when the claimant's depression and psychological treatment "increased in intensity." Id.

---

[3]TENS, or transcutaneous electrical nerve stimulation, units apply electrical current through the skin for pain control. *Tens for Back Pain*, WEBMD (May 18, 2011), http://www.webmd.com/back-pain/guide/tens-for-back-pain.

On October 23, 2008, a medical consultant, Colynethia Burton, performed a physical residual functional capacity assessment of the claimant at the request of the Alabama Disability Determination Service (DDS). (R. 366-73). Ms. Burton concluded that the claimant was not fully credible, as his impairments "could reasonably be expected to produce some, but not all, of his alleged functional limitations." (R. 371). Also at the request of DDS, Dr. Robert Estock, a consultative psychologist, performed a psychological assessment of the claimant on October 24, 2008. Dr. Estock similarly opined that, while the claimant's impairments could reasonably be expected to produce some functional limitations, they were not severe enough to produce all of the claimant's alleged disabilities. (R. 31). He further concluded that the claimant had a moderate degree of limitation in the following areas: daily living; maintaining social functioning; and maintaining concentration, persistence, and pace. Id. Additionally, the claimant "is considered to be not credible . . . when compared to the objective findings" in the medical records because the claimant denied any drug abuse, but records clearly indicate a history of polysubstance abuse. Id.

The claimant also has a history of psychological impairments. On April 10, 2008, the claimant presented to the BVAMC "for supportive therapy due to depression and anxiety." (R. 304). He reported that he had never seen a psychiatrist or mental health professional before, and that he had felt depressed and withdrawn since his medical discharge from the Army in 2005 as a result of his back problems. Id. The examiner reported the claimant to be "stable from a depressive standpoint." (R. 305). The physician prescribed both medication and biweekly psychotherapy for the claimant's depression and anxiety. (R. 297).

On July 25, 2008, the claimant presented to the emergency room stating that he "had thought about suicide because of the pain and [his] depression." (R. 275). The emergency room

attending physician, Dr. Michael Blackstone, and staff psychiatrist, Dr. Zahid Husain, transferred him to Augusta Psychiatric Inpatient center for "safety and stabilization." (R. 285). The emergency room report reveals that the claimant had been non-compliant with his medications, which served to exacerbate his depression. Id. The psychological summary of the claimant's compensation and pension examination from October 2008 reports that the claimant suffered no occupational or social impairment and no inability to perform occupational tasks because of his mental disorder signs and symptoms. (R. 479-80). At a September 2, 2008 follow-up appointment post-hospitalization, the claimant was "stable from a depressive standpoint" with a GAF[4] of 59[5]. (R. 253-54). Then on October 6, 2008, the claimant's GAF measured 61. (R. 430).

A progress note from November 24, 2008 reveals that the claimant had been non-compliant with his psychotherapy follow-up appointments, having missed five consecutive appointments since September 2, 2008. (R. 542). He had made no efforts to contact the mental health clinic to reschedule those missed appointments. Id. A mental health encounter note from August 3, 2009 reveals that claimant stated, "I do not care if I live or die... but I am not going to kill myself... I have a son." (R. 581). He also reported that his pain was back since being taken off of the Lortab for testing positive for cocaine at a previous appointment at the BVAMC. Id.

The claimant also has a history of polysubstance abuse. The claimant signed a chronic narcotic treatment contract at the BVAMC on February 12, 2009. (R. 495-96).The claimant

---

[4]GAF, or Global Assessment of Functioning, scale is a numeric scale (1 through 100) used to rate the social, occupational, and psychological functioning of an adult and how well or adaptive an adult is meeting various problems in living. (R. 24, n. 1)

[5]A rating from 60-51 marks someone who has moderate symptoms or any moderate difficulty in social, occupational, or school functioning. (R. 25, n. 2)

violated his pain contract by using cocaine the night before an appointment on July 27, 2009 and thus could no longer obtain narcotic medications unless and until he completed the outpatient substance abuse clinic (OSAC). (R. 511, 581). At his August 7, 2009 appointment, the claimant reported that he had withdrawn from nursing school two weeks prior and that he had not taken his psychiatric medication in months. (R. 511). On August 11, 2009, a mental health service physician resumed claimant's Wellbutrin prescription. The claimant's GAF measured at 59-62,[6] and the physician noted a treatment plan of supportive therapy, psychological education, and medical management. (R. 504). The claimant completed an evaluation for admission to OSAC, and thus began treatment, in September 2009. (R. 563). He was there "to get [his] meds back due to failing a drug screen." Id. The claimant reported being physically able to live independently and fully care for himself. He also reported having no problems with activities of daily living. (R. 569). Since the claimant's alleged disability date, the record reveals non-compliance with medical treatment and illicit drug use as recent as August 9, 2009. (R. 569).

*The ALJ Hearing*

After the SSA denied the claimant's Title II and Title XVI applications, the claimant requested and received a hearing before an ALJ. (R. 105-06). At the hearing held on December 16, 2009, the claimant testified that his back pain was his primary physical impairment. (R. 59). He told the ALJ that he can only perform an activity for ten to fifteen minutes before the pain in his upper back becomes so severe that he has to be "in a hot shower, on a heating pad or [he has] to be off of [his] feet." (R. 54). Regarding his lower back, he testified that it "feels like something

---

[6] A GAF rating from 70-61 marks someone who has some mild symptoms or some difficulty in social, occupational, or school functioning. (R. 25, n. 2).

is slipping" whenever he tries to "pick up anything heavy." Id. He also stated that he has not had a pain-free day since April 1, 2008. Id. The claimant also said that he had an MRI of his back scheduled for two days after the hearing. (R. 67-68)

The claimant testified that he was currently in physical therapy, attending regular appointments twice a week. (R. 56). The claimant testified to using a cane everyday for the past month. His physical therapist prescribed cane use because of the claimant's stiffness and shooting pain in his right leg. (R. 55, 83). He also testified that he had been using two back braces, for both the upper and lower parts of his back, along with TENS units for the past three to four years. Both were prescribed by previous physical therapists. (R. 56). He stated that he wears the back brace every time he plans on being "away from the house for more than an hour." (R. 73). He also testified that "anything triggers [his] spasms," which occur "whenever [he is] pretty much on [his] feet for more than a good five, maybe ten minutes. Even just from walking to the car. . ." (R. 66).

The claimant testified that his pain keeps him from completing full tasks, such as purchasing everything on his grocery list in one outing. He testified that he can "probably do one-third of it and then go back the next day and do the other... until [he gets] all the stuff that [he] needs." The claimant also stated that he has a three-year-old son who lives with him. He testified that he receives help from his grandmother and his son's mother, who both take care of the boy during the day. The claimant also testified that because of his pain, he cannot work on cars or stay active anymore. (R. 64-65). According to the claimant, when the pain is severe, it affects his concentration and ability to stay focused. (R. 61). The claimant further testified that the lowest he can get his back pain using his best pain management techniques is "about a six" on a scale from

one to ten. However, he stated that "it can get to about a nine." (R. 58).

The claimant testified that he uses various pain management techniques for his back problems. He stated that he takes hot baths, uses Icy Hot, a combination of ice and then heat, and his heating pad. He testified that when he wakes up in the morning, the first thing he does is take a hot shower to limber up the stiffness while he waits for his medication to take affect. He testified that he has to lay down "about seven hours" of every eight-hour work day and that he has problems sleeping even when he is taking trazodone, a prescribed sleep aid. He also testified that an additional reason for his constant need to lay down is the drowsiness side effect of the medications he takes during the day. (R. 61-63).

The claimant also testified that he had been experiencing headaches for the past year. (R. 57-58). He stated that he gets them every day and that they last "pretty much until [he goes] to sleep and wake[s] up." He testified that he initially thought they originated in his back, but that x-rays and tests did not reveal a correlation. He also told the ALJ that he sustained a gunshot wound to the head when he was fifteen years old. However, the claimant did not testify that the injury causes him any continuing discomfort. (R. 57-58).

Additionally, the claimant testified to suffering from various mental impairments. He stated that he "pretty much [doesn't] do anything... he [stays] home." (R. 63). His depression and anxiety affect his ability to concentrate and stay focused. Id. The last time he was hospitalized was because he "was about to commit suicide because of [his] depression. . ." (R. 67). The claimant also testified that his history of episodic cocaine use was a result of his severe depression. He was using cocaine "probably once a week, but mainly on weekends" around his amended onset date of April 2008. However, the claimant stated that all of his urinary drug

11

screens had been negative since July 27, 2009. He claimed to have been "on the straight and narrow since then." (R. 53). The claimant testified that doctors enrolled him in a drug rehabilitation program at the VA that he needed to complete to get his pain medication back. Even though he recently began receiving his pain medication again, he told the ALJ that he asked if he could continue the program on a voluntary basis for an additional ninety days. The claimant told the ALJ that he was no longer in the same state of mind that he was in when he was abusing cocaine and ecstacy because he "actually accept[s] the fact that there's something wrong with [his] back and [he] can't continue living the way [he] used to live" and work. The claimant also stated that his inability to accept his back problems was the reason that he refused to take his depression medications as early as four months prior to the hearing. When asked if he had ever abused alcohol or marijuana, the claimant testified that he "never really had a thing for alcohol" and that marijuana "wasn't really a problem." (R. 69-71).

     A vocational expert, Dr. Robert Griffin, testified concerning the claimant's type of past employment and what skills he had the ability to perform. (R. 78). He stated that the claimant's last job as a security guard was "light and semi-skilled." Id. Dr. Griffin proceeded to ask the claimant a host of questions regarding his past work with car parts, as an overhead crane operator, as a construction worker, and at a packaging plant that made plastic bottles. (R. 78-81). Dr. Griffin characterized the construction job as heavy and semi-skilled, while the job at the packaging plant was light and unskilled. The claimant's past job at a warehouse unloading trucks "is normally in the medium range of exertion and is unskilled," while his past job at McDonald's was "light and semi-skilled." (R. 81). The ALJ then posed the following hypothetical to Dr. Griffin:

> I'd like you to consider a person of the claimant's age, education and work experience who is able to do medium exertional limitations and this individual is limited in the postural area to frequently climbing ramps or stairs, frequently balancing, frequently stooping, kneeling, crouching and crawling, never climbing ropes or ladders. This individual also [needs an] environmental area [where he can] avoid all exposure to moving machinery or unprotected heights. Would such an individual be able to perform the claimant's past relevant work?

(R. 84-85) Dr. Griffin answered that "there would be jobs that he could perform." Dr. Griffin opined that the claimant could complete his past work as a fast food worker, a security guard, and at the plastic bottle packaging plant. The ALJ then posed another hypothetical to Dr. Griffin:

> I'd like you to take that same person, reduce him to a light exertional limit and instead of frequently balancing, just occasionally balancing with a handheld assistive device, and I'd like to add to that to limit this to jobs that can be performed while using a handheld assistive device at all times while standing. And the contralateral upper extremity can be used to lift and carry the exertional limits of light. Environmentally, this hypothetical individual should avoid all exposure to cold and noise . . . and . . . should have only occasional interaction with the public and coworkers. Would such a[n] . . . individual . . . be able to perform the claimant's past relevant work?

(R. 85).  Dr. Griffin answered in the negative. When asked if there would be any other jobs in the national economic that such an individual could perform, Dr. Griffin responded that he did not think of anywhere where such an individual could perform light work while using and maintaining balance with a cane. The ALJ then modified his hypothetical and asked if there would be any sedentary jobs that could be performed. Dr. Griffin answered that there were, in fact, sedentary jobs such a hypothetical individual could perform, including work as a surveillance system monitor. (R. 85-86).

The ALJ then asked Dr. Griffin about the vocational significance of pain. Dr. Griffin

13

testified that pain has a lot of significance, with it being generally accepted that mild to moderate pain anywhere up to a level of six does not prevent an individual from work. Moderately severe to severe pain, on the other hand, is considered too distracting and would prevent an individual from working at any job as it exists in the national economy. The ALJ concluded the hearing by asking Dr. Griffin how the claimant's testified pain levels and amount of time he spends having to lie down would impact the claimant vocationally. Dr. Griffin replied that he did not believe maintaining a forty-hour work week "would be possible" based on the claimant's testimony. (R. 88-89).

*The ALJ's Decision*

On January 26, 2010, the ALJ issued a decision finding no disability. (R. 33). First, the ALJ found that the claimant had not engaged in any substantial gainful activity since the amended alleged onset of his disability. (R. 23). Next, the ALJ found that the claimant had the following severe impairments: levoscoliosis; depression; and headaches. Id. However, the ALJ concluded that these impairments did not singly or in combination manifest the diagnostic findings required to medically equal a Listing. (R. 26). The ALJ additionally determined that the claimant was unable to perform any of his past relevant work as it exceeded his residual functional capacity ("RFC"). Nonetheless, the ALJ ruled that jobs exist in significant numbers in the national economy that the claimant can perform. (R. 32).

The ALJ found that the claimant has mild restrictions in activities of daily living; but, he cares for his own personal needs, manages his own money, shops, goes walking, and makes simple meals. The ALJ further found that the claimant also has mild difficulties in social functioning and concentration, persistence, or pace. The ALJ noted that the claimant's medical

records reveal that when he is non-compliant with his depression medication and is abusing illicit drugs, he reports having problems concentrating; but on his SSA function report, the claimant reported that he is capable of paying attention for however long he needs. While the claimant experienced one episode of decompensation when he was admitted to a psychiatric ward in 2008, the ALJ concluded that because his mental impairment did not cause repeated episodes of decompensation, the claimant did not meet the "paragraph B" criteria of the Listing. (R. 27). The ALJ found that while the claimant's impairments could reasonable be expected to cause the alleged symptoms, the claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible to the extent they are inconsistent with the ALJ's RFC. (R.31).

      To support his conclusions, the ALJ relied on the BVAMC records, to which he gave significant weight, "as they demonstrate a longitudinal history of the claimant's impairments which are supported by the diagnostic testing and treatment." The ALJ noted that given the claimant's alleged completely disabling impairments, one would "expect to see some indication in the treatment records of restrictions placed on the claimant by treating physicians." However, the ALJ found that nowhere in the record are there any such restrictions recommended by any physician. Treating and examining physicians, to the contrary, consistently noted that the claimant's conditions were well-controlled or mild when he was compliant with his medications. The ALJ also noted marked inconsistencies between the claimant's testimony at trial, the medical records, and his self-reported functional limitations on his activities of daily living form. The objective medical evidence of record does not reflect any aggravation of the claimant's back condition that would support his alleged disability. (R. 30).

Additionally, the ALJ underscored that the medical evidence reveals that when the claimant is compliant with his medications and refrains from illicit drug use, he is able to attend to his own personal needs and interact with others without significant difficulty. The ALJ admitted that while the claimant's mental impairment does cause some restrictions, no evidence of the record indicates that this impairment causes any more than mild functional limitations. Due to the inconsistencies between the claimant's testimony and the objective medical evidence, when considered in its entirety, the ALJ determined the claimant's testimony to not be fully credible. Furthermore, the ALJ concluded that the evidence did not satisfy the Eleventh Circuit law on subjective pain (the "pain standard"), nor did it establish an underlying medical condition that is of such severity as to be expected to give rise to the claimant's alleged symptoms. (R. 31).

Next, the ALJ discussed the consultative psychological assessment performed by Dr. Robert Estock and the physical residual functional capacity assessment performed by Colynethia Burton, both at the request of DDS. The ALJ admitted that while the reports were not entitled to controlling weight, they were generally consistent with the medical record. Thus, they were entitled to some weight. The ALJ additionally admitted to giving the claimant "the benefit of the doubt," even though his testimony was inconsistent with the medical evidence, and thereby reduced the claimant's residual functional capacity (RFC) to that below what the medical evidence, alone, would dictate. (R. 31).

After consideration of the record, the ALJ concluded that the claimant had the following RFC:

> ... to perform sedentary work . . . except with the need for a sit/stand option, allowing claimant to stand every hour to stretch for a brief 5 minute period and resume sitting or standing as

>    tolerated; can frequently climb ramp or stairs; can frequently stoop, kneel, and crouch; can occasionally balance with a handheld assistive device; never climb ladders, ropes or scaffolds and never crawl; limited to jobs that can be performed while using a right handheld assistive device at all times when standing and the contralateral upper extremity can be used to lift and carry up to the sedentary exertional limits; and avoid concentrated exposure to cold and noise; as well as avoid all exposure to hazardous machinery and unprotected heights; and only occasional interaction with the public and with coworkers.

(R. 28).

After concluding that the demands of the claimant's past relevant work exceed this residual functional capacity, the ALJ proceeded to the final step of the evaluation process. In considering the claimant's age, education, work experience, RFC, and testimony from the vocational expert, the ALJ concluded that jobs exist in significant numbers in the national economy that the claimant can perform and to which he can make a successful adjustment. Therefore, the ALJ found that the claimant is not disabled under the Social Security Act. (R. 32).

## VI. DISCUSSION

The claimant asserts that no physical or mental RFC is in the file other than the non-examining sources of the state agency. Further, because the claimant's treating source is the BAVMC, the claimant argues that it was not possible to get an RFC completed by a treating physician. As such, the claimant maintains, the ALJ's duty to develop the record included a duty to send the claimant for a consultative evaluation because of both his physical and mental impairments. To the contrary, this court finds that substantial evidence supports the ALJ's decision. The ALJ, thus, was not obligated to order a consultative examination to make an informed decision.

Given the ALJ's duty to develop the medical record fully and fairly, "[i]t is reversible

.

error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." Holladay v. Bowen, 848 F.2d 1206, 1209-10 (11th Cir. 1988); see also Reeves v. Heckler, 734 F.2d 519, 522 n1 (11th Cir. 1984). However, an ALJ is not required to seek additional independent expert medical testimony before making a disability determination if the record is sufficient and additional expert testimony would not be necessary. Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999).

The claimant argues that the ALJ's failure to develop the record fully by not obtaining an RFC from a consultative examiner regarding both his physical and mental impairments was reversible error. However, the ALJ is not required to seek independent expert medical testimony, or order a consultative examination, before deciding a claimant's case when the record provides sufficient evidence to support the ALJ's decision. Because the medical evidence of record was sufficient for the ALJ to make an informed decision, the ALJ was not required to order a consultative examination. Furthermore, the claimant has not shown that a consultative examination would have demonstrated any limitations beyond those that the ALJ included in his RFC.

Additionally, the claimant asserts that because his treating source is the BAVMC, it, therefore, was impossible to obtain an RFC by a treating physician. The claimant appears to argue that the ALJ *must* obtain an RFC from a treating physician. However, the ALJ has the authority to make an RFC assessment based upon all of the relevant evidence of a claimant's remaining ability to do work despite his impairments. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.); see also 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ properly assessed the claimant's RFC based on the objective medical evidence and the testimony of the vocational

expert.

In determining whether substantial evidence exists to support the ALJ's decision, the court also must examine whether the ALJ property applied the pain standard to assess the claimant's subjective complaints of pain.  A three-part "pain standard" applies when a claimant attempts to establish disability through his own testimony or other subjective symptoms. The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002); see also Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Kelley v. Apfel, 185 F.3d 1211, 1215 (11th Cir. 1999).

The ALJ properly applied the "pain standard" when making his determination that, while the claimant has medically determinable impairments that could reasonably be expected to cause the alleged symptoms, the objective medical records do not support the claimant's statements concerning the alleged intensity and limiting effects of these symptoms. The ALJ accurately gave significant weight to the medical records from the BAVMC as objective medical evidence because "they demonstrated a longitudinal history of the claimant's impairment which are supported by the diagnostic testing and treatment." (R. 30). Nowhere in these medical records does a physician offer an opinion that the claimant is restricted from all work. To the contrary, the claimant's impairments are reported as well-controlled when the claimant is compliant with his medications and not engaging in polysubstance abuse.

Because substantial evidence supports the ALJ's determination that the claimant was not

disabled, the ALJ did not need to order a consultative examination under his duty to develop the record. While evidence of the claimant's underlying medical condition existed, the objective medical evidence did not confirm the severity of the claimant's alleged pain arising from that condition, nor did it confirm the severity of his alleged mental limitations.

## VII. CONCLUSION

The court has carefully reviewed the entire record in this case and finds that substantial evidence supports the Commissioner's decision and that the Commissioner applied proper legal standards in reaching that decision. Accordingly, the court affirms the decision of the Commissioner.

The court will enter a separate Order in conformity with this memorandum opinion.

DONE and ORDERED this 1st day of May, 2012.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE